**07 C 6876**

**JUDGE ANDERSEN
MAGISTRATE JUDGE BROWN**

# EXHIBIT 1

| | |
|---|---|
| 2120 - Served | 3120 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| **SUMMONS** | **ALIAS - SUMMONS** |

CCG N001-75M-2/28/05 (43480658)

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, _____Law Division_____ DIVISION

(Name all parties)

Joshua Rogers

v.

Ameriprise Financial Services, Inc.
208 South LaSalle St., Suite 814
Chicago, IL 60604

**SUMMONS**

No. 2007L012299
CALENDAR/ROOM Q
TIME 00:00
Retaliatory Discharge

2007L012299
CALENDAR/ROOM Q
TIME 00:00
Retaliatory Discharge

**To each Defendant:**

**YOU ARE SUMMONED** and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ **Richard J. Daley Center, 50 W. Washington, Room** _____ **, Chicago, Illinois 60602**

☐ **District 2 - Skokie**
5600 Old Orchard Rd.
Skokie, IL 60077

☐ **District 3 - Rolling Meadows**
2121 Euclid
Rolling Meadows, IL 60008

☐ **District 4 - Maywood**
1500 Maybrook Ave.
Maywood, IL 60153

☐ **District 5 - Bridgeview**
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ **District 6 - Markham**
16501 S. Kedzie Pkwy.
Markham, IL 60426

☐ **Child Support**
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

WITNESS, _____,

OCT 3 0 2007

Atty. No.: 34444

Name: Jason Dai

Atty. for: Plaintiff

Address: 123 West Main Street

City/State/Zip: Barrington, IL 60010

Telephone: (847) 387-2221

Service by Facsimile Transmission will be accepted at: _____

DOROTHY BROWN
CLERK OF CIRCUIT COURT

_____
**Clerk of Court**

Date of service: _____
(To be inserted by officer on copy left with defendant or other person)

(Area Code)    (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
11/06/2007
CT Log Number 512762511

**TO:**    Litigation Counsel
Ameriprise Financial, Inc.
50587 Ameriprise Financial Center
Minneapolis, MN 55474

**RE:**    **Process Served in Illinois**

**FOR:**   Ameriprise Financial Services, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Joshua Rogers, Pltf. vs. Ameriprise Financial Services, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Affidavit, Jury Demand, Complaint, Exhibit(s) |
| **COURT/AGENCY:** | Cook County Circuit Court - Cook County Department - Law Division, IL<br>Case # 2007 L 01299 |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination - 06/19/2007 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Chicago, IL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/06/2007 at 12:00 |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Jason M. Dai<br>Barney, Owens, Laughlin & Arthur, LLP<br>323 W. Main Street<br>Barrington, IL 60010<br>847-382-2221 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 798803445109<br>Image SOP - Page(s): 25<br>Email Notification, Litigation Counsel Litigation_Team@ampf.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:** | C T Corporation System<br>Tawana Carter<br>208 South LaSalle Street<br>Suite 814<br>Chicago, IL 60604 |
| **TELEPHONE:** | 312-345-4336 |

Page 1 of  1 / KS

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of package only, not contents.

## IN THE CIRCUIT COURT OF COOK COUNTY
## STATE OF ILLINOIS, LAW DIVISION

| | |
|---|---|
| JOSHUA ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AMERIPRISE FINANCIAL | ) |
| SERVICES, INC., | ) |
| | ) |
| Defendant, | ) |

## COMPLAINT

Plaintiff, Joshua Rogers ("Rogers"), for his Complaint against Defendant Ameriprise Financial Services, Inc. ("Ameriprise") states as follows:

## PARTIES

1.     Rogers is a resident of the State of Illinois.

2.     Ameriprise is a corporation organized and existing under the Laws of the State of Delaware.

## COMMON FACTS

3.     At all relevant times, Ameriprise was and remains a nationwide financial services firm whose agents, advisors and representatives are engaged in the sales of publicly traded securities as defined by the Investment Advisors Act of 1940 and the Securities Exchange Act of 1934.

4.     Rogers was hired by Ameriprise in 1999 as a financial advisor. Between 1999 and 2001, Rogers was: (1) Ameriprise's number one producing financial advisor among first year advisors in the nation for the year 2000; (2) awarded the President's Award for Outstanding Quality of Financial Advice three times in three years; (3)

maintained outstanding scores on client satisfaction surveys; and (4) never had a complaint registered against him from any of Ameriprise's clients.

5.     In 2001, Rogers was promoted to the position of District Manager of Sales in Washington D.C.  In this capacity, Rogers: (1) grew the largest and most productive district in the Washington DC/Baltimore market group; (2) was ranked Ameriprise's number one District Manager in the nation by 2003; (3) achieved an average of ninety-percent (90%) retention of the advisors working under him as District Manager; and (4) maintained a "Gold Team" status in production levels as an advisor, an unprecedented accomplishment nationwide among other District Managers.

6.     In 2003, Rogers was promoted to the position of Field Vice President of Sales in Chicago, Illinois.  When Rogers took over as Field Vice President in Chicago, the area was ranked number 112 out of 115 areas in Ameriprise.[1]  By the end of 2005, Rogers had turned around the Chicago market into the number one area in the nation. Rogers received the highest possible performance ratings (top three percent of all field executives) given by senior management for three straight years.

### Ameriprise's Senior Management Encourages Financial Advisors to Employ Sales Techniques That Violate the Illinois Securities Law of 1953.

7.     At all relevant times, Ameriprise's agents, advisors and representatives were engaged in the sale of universal variable life insurance policies ("VUL").  The policyholders of the VULs were required to bear the market risk as it pertained to the cash value of said policies in that the cash values were invested in mutual funds, rendering the same "securities".

8.     At all relevant times, Ameriprise maintained financial services offices throughout the United States. Ameriprise's corporate management kept track of the

---

[1] In 2003, Ameriprise was doing business under the name "American Express Financial Advisors".

successes and failures of each regional office vis-à-vis their counter-parts nationwide. Field vice presidents were encouraged to competitively best their intra-corporate colleagues in financial services sales.

9.    During the year 2006, Rogers learned that some of his intra-corporate competitive colleagues were employing a dubious sales technique for the sales of VULs called the "million dollar step-down sales technique".  Ameriprise has numerous written training materials and/or manuals regarding techniques for selling VULs. However, none of the materials refer to the million dollar step-down sales technique because of its unscrupulous nature.

10.    Under the million dollar step-down sales technique, Ameriprise's financial advisors were misrepresenting facts to prospective purchasers, specifically, that it would be cheaper to purchase $1,000,000 VULs rather than purchasing next lower steps of the same (i.e. $750,000 and $500,000).  In addition to the aforementioned misrepresentation, said advisors were also fallaciously telling customers that if they purchased a VUL with a one million dollar death benefit, Ameriprise would initiate a post-contractual reduction of said death benefit so the customer could lock in a lower unit cost of insurance upon executing a VUL.

11.    During the year 2006, Ameriprise's senior management began encouraging financial advisors company-wide to systematically employ the use of the million dollar step-down sales technique for purposes of selling VULs.

12.    The million dollar step-down sales technique violates the Illinois Securities Law of 1953, at 815 ILCS 5/12J in that Ameriprise's financial advisors systematically misrepresented to prospective purchasers that it is cheaper to purchase $1,000,000 VULs as opposed to purchasing lesser policies.   This is a material misrepresentation used company-wide to falsely entice prospective customers into

purchasing larger VULs because out-of-pocket expenses are greater for $1,000,000 VULs vis-à-vis smaller VULs.    Additionally, the financial advisors are encouraged to systematically avoid advising prospective purchasers that once an algorithm is applied to calculate the minimum no-lapse premium for VULs, the application: (a) increases the prospective purchaser's premium to a greater extent as it pertains to $1,000,000 VULs compared to a smaller policy; and (b) aggravates the disparity between cost of insurance to prospective purchaser and the total premium between $1,000,000 VULs and smaller policies.

13.    The intention and effect of the above misrepresentations is, by means of company-wide artifice, to defraud potential purchasers of securities and to: (a) increase premiums paid to Ameriprise; (b) increase commissions paid to financial advisors employing the million dollar step-down sales technique; and (3) increase total policies and aggregated death benefits sold by Ameriprise for purposes of bettering its rankings among its competitors.

14.    The million dollar step-down sales technique sales technique additionally violates the Illinois Secirities Law of 1953, at 815 ILCS 5/12J in that Ameriprise's financial advisors systematically misrepresent to prospective purchasers of VULs that Ameriprise would be willing to initiate post-contractual reductions of death benefits so that the customer could lock in lower unit costs of insurance upon executing a VUL and/or omit disclosing that reductions in death benefits require the policyholder to initiate said reduction.[2]   Under the million dollar step-down sales technique, financial advisors were encouraged by Ameriprise to advise prospective purchasers to buy $1,000,000

---

[2] Under the VULs sold by Ameriprise, upon executing a VUL the policy holder is allowed a thirty day window to review the prospectus.  The prospectus is mailed to the policy holder after the policy holder purchases the policy and is the only medium of expression in which the policy holder is notified that he or she has the obligation to reduce his or her death benefits if he or she intends to.

4

VULs even when said purchasers indicated they wished to purchase policies with lesser death benefits via the misrepresentation and/or omission from disclosure described in the sentence above. In reality, Ameriprise representatives never initiated death benefit reductions for their VULs purchasers. Rather, by taking no action and via the misrepresentations and/or omissions from disclosure described above, the policy holder continues to pay the $1,000,000 VUL premium throughout the life of the policy even though he or she never intended to do so and was defrauded by Ameriprise representatives into believing he or she would never have to.

15.    In 2006, Rogers learned of an Ameriprise internal investigation of one its Field Vice Presidents, Ted Jenkins ("Jenkins"). Ameriprise disciplined Jenkins for forging the signatures of its policy holders on documents entitled "Financial Plan Assurance Delivery Forms" and "Client Insurance Delivery Receipts" ("Policy Review Forms") as they pertained to VULs. The Policy Review Forms and the prospectuses, as company procedure, were to be mailed to policy holders after said policy holders purchased VULs and were required by Ameriprise to be signed and returned to Ameriprise. The date affixed by the policyholder would commence the policyholder's thirty-day period that policyholders were allowed to review the terms of the VULs. By forging the signatures, the effected policyholders never had policies delivered to them and/or were defrauded out of their right to review and cancel the VULs.

16.    In a series of conversations between September 2006 and May 2007, Rogers was advised by Robert Whalen ("Whalen")[3] that Ameriprise's upper management was encouraging the use of the million dollar step-down sales technique as a company-wide sales technique. In each such conversation, Rogers advised Whalen that

---

[3] Whalen is the Group Vice President for the Chicago market for Ameriprise. At all relevant times, Whalen had supervisory authority over Rogers.

he believed the million dollar step-down sales technique violated the securities laws which regulated Ameriprise, especially in light of the situation involving Jenkins. Whalen encouraged Rogers to comply with the wishes of upper management and disregard his concerns regarding the illegality of the million dollar step-down sales technique.

17.    Each time that Whalen encouraged Rogers to comply with the million dollar step-down technique, Rogers refused.    Furthermore, during each such conversation, Rogers vehemently urged Whalen to investigate the impropriety of the sales technique and use his authority to prohibit Ameriprise representatives from utilizing it.  Rogers' objections notwithstanding, the million dollar step-down sales technique was and remains the most pervasive sales technique employed by Ameriprise financial advisors.

### Ameriprise Senior Management Encourages Corporate Officers To Violate The Illinois Criminal Code

18.    At all relevant times, Ameriprise was obligated under the above-cited provision of the securities Exchange Act of 1934 to file 15(d) disclosures with the Securities Exchange Commission.

19.    During the fourth economic quarter of 2006, Rogers was told by Whalen, Peter Volarde[4] and Brian Heath[5] that all field vice presidents were to falsify effective dates of, and, if necessary, forge delayed effective dates for, all financial advisor

---

[4] Peter Volarde ("Volarde") is the Senior Vice President of Ameriprise.  At all relevant times, Volarde had supervisory authority over Rogers.

[5] Brian Heath ("Heath") is the Executive Vice President of Ameriprise.  At all relevant times, Heath had supervisory authority over Rogers.

terminations of employment[6]. Specifically, Rogers was directed to make it appear if any financial advisor resigned in the fourth economic quarter, to make his or her personnel resignation paperwork to falsely reflect that said resignation occurred in the First economic quarter of 2007.

20.   Rogers' superiors explained to Rogers that Ameriprise needed to dilute the impact of a disappointing performance in numerous Generally Accepted Accounting Principle ("GAAP") and non-GAAP metrics reported in Ameriprise's Form 10-K annual report for the year ending 2006, required of its 15(d) disclosures.  Rogers refused stating that falsifying and forging said records would cause Ameriprise to intentionally file false 15(d) disclosures with the Securities Exchange Commission.

21.   Since Rogers' promotion to Field Vice President, Rogers' superiors propagated that Ameriprise's historical underwhelming annual performances in traditional GAAP metrics were offset by more subtle metrics, such as quantity of "employee advisors."  However, the numbers from the anticipated year ending in 2006 threatened Ameriprise's customarily relied upon crutch.

22.   During the fourth economic quarter of 2006, Rogers received notices of termination of employment from some of the financial advisors under his charge.  In each such instance, he accurately documented the true dates of terminations for each such financial advisor, rather than falsifying and/or forging the advisors' effective dates of resignation.

23.   During the fourth economic quarter of 2006, Rogers was confronted by Whalen regarding his refusal to abide by the direction given to all field vice presidents regarding employment terminations of financial advisors.  Whalen specifically directed

---

[6] If a financial advisor terminated his employment, the advisor would tender a resignation form affixing the date of resignation upon the form.  It was these affixations regarding the effective date of resignations that Rogers was instructed to forge to reflect dates after Ameriprise's 2006 Form 10-K annual report was due.

Rogers to forge the effective date of a particular financial advisor who terminated his employment with Ameriprise in December 2006. Rogers refused, stating his obedience to such instructions would be both unethical and in violation of the law. It was the field vice presidents' reports of termination and new hirings that were used as Ameriprise's raw data for its 15(d) filings for the metric of advisor growth.

24.    Upon information and belief, Rogers believes that despite his refusal to abide by the direction given to all field vice presidents regarding employment terminations of financial advisors, most other field vice presidents complied with such instruction.

25.    By falsifying and forging the effective dates of financial advisor terminations in the manner demanded by Whalen, Volarde and Heath would cause Ameriprise's 15(d) filings to falsely reflect that Ameriprise had a significantly greater number employee financial advisors employed by Ameriprise than it did.

26.    For any corporate officer and/or director to cause Ameriprise to file 15(d) disclosures with the Securities Exchange Commission containing a material misstatement or omission, having the intent to defraud /or evade financial disclosures, violates the Illinois Criminal Code at 720 ILCS 5/16-26, 720 ILCS 5/5-2 and/or 720 ILCS 5/8-2.

27.    A review of Ameriprise's 15(d) filings evidences what has been reported above. According to Ameriprise's Form 10-K annual report, dated February 27, 2007 (**"Exhibit A"**), Ameriprise reported declining performances in such metrics as total revenue, net income (compared to 2004) and net cash provided by operating activities. Ameriprise reported increases in debt, accounts payable and accrued expenses as well as total liabilities. A review of Ameriprise's Form 8-K filings (**"Exhibit B"**) reveals that the number of financial advisors employed by Ameriprise peaked at 3,178 in the fourth quarter of 2006. Not surprisingly, by the first of quarter 2007, that number had declined

8

to 2,987 (equivalent to a six percent decline) and 2,371 (equivalent to a fourteen percent decline compared to the fourth quarter of 2006) by the second quarter of 2007.[7]

28.    Shortly after Ameriprise released its first quarter 2007 Form 8-K 15(d) disclosures, Whalen confronted Rogers regarding Rogers refusal to abide by the direction given to all field vice presidents regarding employment terminations of financial advisors.    Rogers then raised again his previously stated objections regarding Ameriprise's violations of laws as alleged above and argued passionately that Ameriprise needed to take action to remedy the same and urged Whalen to use his authority to do so.

29.    On June 19, 2007, Ameriprise terminated Rogers' employment, motivated by his objections to Ameriprise's violations of law, as well as other illegal motives on the part of Ameriprise.

30.    Approximately six weeks later, Ameriprise released its second quarter 2007, Form 8-K 15(d) disclosures reporting a fourteen percent decline in employee advisors from December 2006.

## COUNT I
## RETALIATORY DISCHARGE
## (THE MILLION DOLLAR STEP-DOWN SALES TECHNIQUE)

31.    Plaintiff repeats and realleges paragraphs 1 through 30 as though fully set forth herein.

32.    Rogers' discharge by Ameriprise was in retaliation for Rogers' activities of opposing, objecting, and refusing to employ the million dollar step-down sales technique.

---

[7] See page three of Rogers' Exhibit B.  It should be noted that percentages quoted above compare Form 8-K employee advisors from the first and second quarters of 2007 to the fourth quarter of 2006.  Ameriprise's percentages as indicated on page 3 of Exhibit B compare second quarter performances between 2006 and 2007.

33.    Amerprise's systematic and company-wide use of the million dollar step-down sales technique violates the Illinois Securities Law of 1953, at 815 ILCS 5/12J as alleged in paragraphs 12 through 14 above.

34.    Plaintiff's discharge violates a clear mandate of public policy.

35.    As a direct and proximate result of Defendant's conduct, Rogers has suffered injury and damages in amounts according to proof at trial.

WHEREFORE, Rogers prays of this Honorable Court to enter a judgment in favor of Rogers and against Ameriprise in excess of One-Hundred Thousand Dollars ($100,000.00). Rogers further prays that he be awarded his costs and be granted such other relief as is just and equitable. Rogers also requests an award of punitive damages to be determined at trial.

## COUNT II
## RETALIATORY DISCHARGE
## (AMERIPRISE'S FALSIFIED 15(d) FILINGS BEFORE THE SEC)

36.    Plaintiff repeats and realleges paragraphs 1 through 35 as though fully set forth herein.

37.    Rogers' discharge by Ameriprise was in retaliation for Rogers' activities of opposing, objecting, and refusing to falsify effective dates of and/or forge delayed effective dates for, all financial advisor terminations of employment, so as to make it appear that Ameriprise's field force growth of financial advisors was significantly growing when in fact it was precipitously plummeting.

38.    Amerprise's systematic and company-wide use of the million dollar step-down sales technique violated the Illinois Criminal Code at 720 ILCS 5/16-26, 720 ILCS 5/5-2 and/or 720 ILCS 5/8-2, as alleged in paragraphs 23 through 26 above .

39.    Rogers' discharge violates a clear mandate of public policy.

40.    As a direct and proximate result of Ameriprise's conduct, Rogers has suffered injury and damages in amounts according to proof at trial.


WHEREFORE, Rogers prays of this Honorable Court to enter a judgment in favor of Rogers and against Ameriprise in an amount in excess of One-Hundred Thousand Dollars ($100,000.00). Rogers further prays that he be awarded his costs and be granted such other relief as is just and equitable. Rogers also requests an award of punitive damages to be determined at trial.


Respectfully submitted,


Jason M. Dai


Jason M. Dai
#34444
Barney, Owens, Laughlin & Arthur, LLP
323 W. Main Street
Barrington, Illinois  60010
847-382-2221

# EXHIBIT A

**Rogers Exhibit A**

AMERIPRISE FINANCIAL, INC.

SCHEDULE I—CONDENSED FINANCIAL INFORMATION OF REGISTRANT

CONDENSED STATEMENTS OF INCOME

(Parent Company Only)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | | (in millions) | |
| **Revenues** | | | |
| Management, financial advice and service fees | $ 60 | $ 339 | $ 413 |
| Distribution fees | 73 | 54 | 19 |
| Net investment income | 59 | 20 | 19 |
| Other revenues | 6 | 6 | 10 |
| Total revenues | 198 | 419 | 461 |
| **Expenses** | | | |
| Compensation and benefits | 467 | 418 | 356 |
| Interest and debt expense | 108 | 70 | 51 |
| Separation costs | 137 | 76 | — |
| Other expenses | (53) | 30 | 182 |
| Total expenses | 659 | 594 | 589 |
| Loss before income tax benefit and equity in earnings of subsidiaries | (461) | (175) | (128) |
| Income tax benefit | (179) | (27) | (15) |
| Loss before equity in earnings of subsidiaries | (282) | (148) | (113) |
| Equity in earnings of subsidiaries: | | | |
| Equity in earnings of subsidiaries | 913 | 706 | 938 |
| Equity in income from discontinued operations of subsidiary, net of tax | — | 16 | 40 |
| Equity in cumulative effect of accounting change in subsidiaries, net of tax | — | — | (71) |
| Total equity in earnings of subsidiaries | 913 | 722 | 907 |
| Net income | $ 631 | $ 574 | $ 794 |

*See Notes to Condensed Financial Information of Registrant.*

F-2

# AMERIPRISE FINANCIAL, INC.

## SCHEDULE I—CONDENSED FINANCIAL INFORMATION OF REGISTRANT

### CONDENSED BALANCE SHEETS

#### (Parent Company Only)

| | December 31, | |
|---|---:|---:|
| | 2006 | 2005 |
| | (in millions, except share data) | |
| **Assets** | | |
| Cash and cash equivalents | $ 1,346 | $ 1,192 |
| Investments | 320 | 303 |
| Receivables | 62 | 29 |
| Due from subsidiaries | 128 | 148 |
| Land, buildings, equipment, and software, net of accumulated depreciation of $409 and $336, respectively | 611 | 566 |
| Investment in subsidiaries | 8,265 | 7,777 |
| Other assets | 229 | 214 |
| Total assets | $ 10,961 | $ 10,229 |
| **Liabilities and Shareholders' Equity** | | |
| Liabilities: | | |
| Accounts payable and accrued expenses | $ 641 | $ 599 |
| Due to subsidiaries | 335 | 245 |
| Payable to American Express | 52 | 16 |
| Debt | 2,000 | 1,550 |
| Other liabilities | 8 | 132 |
| Total liabilities | 3,036 | 2,542 |
| Shareholders' Equity: | | |
| Common shares ($.01 par value; shares authorized, 1,250,000,000; shares issued, 252,909,389 and 249,998,206, respectively) | 3 | 2 |
| Additional paid-in capital | 4,353 | 4,091 |
| Retained earnings | 4,268 | 3,745 |
| Treasury shares, at cost (11,517,958 and 122,652 shares, respectively) | (490) | — |
| Accumulated other comprehensive loss, net of tax, including amounts applicable to equity investments in subsidiaries: | | |
| Net unrealized securities losses | (187) | (129) |
| Net unrealized derivative gains (losses) | (1) | 6 |
| Foreign currency translation adjustment | (18) | (25) |
| Defined benefit plans | (3) | (3) |
| Total accumulated other comprehensive loss | (209) | (151) |
| Total shareholders' equity | 7,925 | 7,687 |
| Total liabilities and shareholders' equity | $ 10,961 | $ 10,229 |

*See Notes to Condensed Financial Information of Registrant.*

F-3

# AMERIPRISE FINANCIAL, INC.

## SCHEDULE I—CONDENSED FINANCIAL INFORMATION OF REGISTRANT

## CONDENSED STATEMENTS OF CASH FLOWS

### (Parent Company Only)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| | (in millions) | | |
| **Cash Flows from Operating Activities** | | | |
| Net income | $ 631 | $ 574 | $ 794 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Equity in earnings of subsidiaries | (913) | (706) | (938) |
| Equity in income from discontinued operations of subsidiary, net of tax | — | (16) | (40) |
| Equity in cumulative effect of accounting change in subsidiaries, net of tax | — | — | 71 |
| Dividends received from subsidiaries and affiliates | 670 | 486 | 1,147 |
| Other operating activities, primarily with subsidiaries | 139 | 615 | 124 |
| Net cash provided by operating activities | 527 | 953 | 1,158 |
| **Cash Flows from Investing Activities** | | | |
| Available-for-Sale securities: | | | |
| Proceeds from sales | 23 | 243 | 156 |
| Maturities, sinking fund payments and calls | 401 | 179 | 21 |
| Purchases | (347) | (278) | (162) |
| Purchase of land, buildings, equipment and software | (153) | (113) | (100) |
| Investment in subsidiaries | (220) | (924) | (29) |
| Acquisition of loans | (33) | — | — |
| Change in loans | 2 | — | — |
| Net cash used in investing activities | (327) | (893) | (114) |
| **Cash Flows from Financing Activities** | | | |
| Proceeds from issuances of debt, net of issuance costs | 494 | 2,843 | — |
| Principal repayments of debt | (50) | (1,350) | (78) |
| Payable to American Express, net | 36 | (1,578) | 263 |
| Capital transactions with American Express, net | — | 1,256 | 40 |
| Dividends paid to American Express | — | (53) | (1,325) |
| Dividends paid to shareholders | (108) | (27) | — |
| Repurchase of common shares | (490) | — | — |
| Exercise of stock options | 20 | — | — |
| Excess tax benefits from share-based compensation | 52 | — | — |
| Net cash provided by (used in) financing activities | (46) | 1,091 | (1,100) |
| **Parent Company Operations Applicable to Discontinued Operations of Subsidiary** | | | |
| Net cash provided by operating activities | — | 48 | 95 |
| Net cash used in financing activities | — | (24) | (40) |
| Net cash provided by Parent Company operations applicable to discontinued operations of subsidiary | — | 24 | 55 |
| Net increase (decrease) in cash and cash equivalents | 154 | 1,175 | (1) |
| Cash and cash equivalents at beginning of year | 1,192 | 17 | 18 |
| Cash and cash equivalents at end of year | $1,346 | $1,192 | $ 17 |
| Supplemental Disclosures: | | | |
| Interest paid | $ 104 | $ 80 | $ 52 |
| Income taxes received, net | 124 | 169 | 21 |
| Non-cash dividend of AEIDC to American Express | — | 164 | — |

*See Notes to Condensed Financial Information of Registrant.*

# EXHIBIT B

## Rogers Exhibit B

# FOURTH QUARTER 2006

**Ameriprise Financial, Inc.**
**Financial Advisor and Client Metrics**

| (unaudited) | 4Q 2005 | 1Q 2006 | 2Q 2006 | 3Q 2006 | 4Q 2006 | 4Q'06 vs. 4Q'05 % Change | YTD 2005 | YTD 2006 |
|---|---|---|---|---|---|---|---|---|
| **Financial Advisors** | | | | | | | | |
| Employee advisors | 3,268 | 3,075 | 3,056 | 3,063 | 3,178 | (3)% | 3,268 | 3,178 |
| Franchisee advisors | 7,392 | 7,491 | 7,499 | 7,571 | 7,651 | 4% | 7,392 | 7,651 |
| Total branded financial advisors | 10,660 | 10,566 | 10,555 | 10,634 | 10,829 | 2% | 10,660 | 10,829 |
| Securities America, Inc. registered representatives | 1,780 | 1,813 | 1,817 | 1,793 | 1,763 | (1)% | 1,780 | 1,763 |
| Total financial advisors | 12,440 | 12,379 | 12,372 | 12,427 | 12,592 | 1% | 12,440 | 12,592 |
| Employee advisor retention | 64% | 62% | 60% | 63% | 63% | | 64% | 63% |
| Franchisee advisor retention | 91% | 91% | 91% | 93% | 93% | | 91% | 93% |
| Gross dealer concession per branded advisor (in thousands) | $ 38.7 | $ 43.8 | $ 44.7 | $ 45.0 | $ 49.2 | 27% | $ 154.7 | $ 182.7 |
| **Client Relationships** | | | | | | | | |
| Total clients (in thousands) | 2,776 | 2,762 | 2,770 | 2,779 | 2,786 | — | 2,776 | 2,786 |
| Client retention | 94% | 92% | 93% | 93% | 93% | | 94% | 93% |
| Branded advisor clients (in thousands) | 1,991 | 1,990 | 1,950 | 1,925 | 1,933 | (3)% | 1,991 | 1,933 |
| Clients with a financial plan percentage | 44% | 44% | 44% | 44% | 45% | | 44% | 45% |
| Financial plans sold (in thousands) | 55 | 63 | 58 | 55 | 61 | 11% | 233 | 237 |

---

\#    Variance of 100% or greater.

4

* This exhibit page is taken from Page 4 of Exhibit 99.2 of Ameriprise's 1-25-2007, Form 8-K, Fourth Quarter 2006 filing with the Securities Exchange Commission. Emphasis in red added.

# FIRST QUARTER 2007

**Ameriprise Financial, Inc.**
**Financial Advisor and Client Metrics**

| (unaudited) | 1 Qtr 2006 | 2 Qtr 2006 | 3 Qtr 2006 | 4 Qtr 2006 | 1 Qtr 2007 | 1Q '07 vs. 1Q '06 % Change | Full Year 2006 |
|---|---|---|---|---|---|---|---|
| **Financial Advisors** | | | | | | | |
| Employee advisors | 3,075 | 3,056 | 3,063 | 3,178 | 2,987 | (3)% | 3,178 |
| Franchisee advisors | 7,491 | 7,499 | 7,571 | 7,651 | 7,611 | 2% | 7,651 |
| Total branded financial advisors | 10,566 | 10,555 | 10,634 | 10,829 | 10,598 | — | 10,829 |
| Securities America, Inc. registered representatives | 1,813 | 1,817 | 1,793 | 1,763 | 1,744 | (4)% | 1,763 |
| Total financial advisors | 12,379 | 12,372 | 12,427 | 12,592 | 12,342 | — | 12,592 |
| | | | | | | | |
| Employee advisor retention | 62% | 60% | 63% | 63% | 63% | | 63% |
| Franchisee advisor retention | 91% | 91% | 93% | 93% | 93% | | 93% |
| | | | | | | | |
| Gross dealer concession per branded advisor (in thousands) | $ 43.8 | $ 44.7 | $ 45.0 | $ 49.2 | $ 51.1 | 17% | $ 182.7 |
| | | | | | | | |
| **Client Relationships** | | | | | | | |
| Total clients (in thousands) | 2,762 | 2,770 | 2,779 | 2,786 | 2,774 | — | 2,786 |
| Client retention | 92% | 93% | 93% | 93% | 93% | | 93% |
| | | | | | | | |
| Branded advisor clients (in thousands) | 1,990 | 1,950 | 1,925 | 1,933 | 1,939 | (3)% | 1,933 |
| | | | | | | | |
| Clients with a financial plan percentage | 44% | 44% | 44% | 45% | 45% | | 45% |
| | | | | | | | |
| Financial plans sold (in thousands) | 63 | 58 | 55 | 61 | 66 | 5% | 237 |

---

# Variance of 100% or greater.

3

---

\* This exhibit page is taken from Page 3 of Exhibit 99.2 of Ameriprise's 4-24-2007, Form 8-K, First Quarter 2007 filing with the Securities Exchange Commission. Emphasis in red added.

# SECOND QUARTER 2007

**Ameriprise Financial, Inc.**
**Financial Advisor and Client Metrics**

| (unaudited) | 2 Qtr 2006 | 3 Qtr 2006 | 4 Qtr 2006 | 1 Qtr 2007 | 2 Qtr 2007 | 2Q '07 vs. 2Q '06 % Change | Year-to-Date 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|
| **Financial Advisors** | | | | | | | | |
| Employee advisors | 3,056 | 3,063 | 3,178 | 2,987 | 2,731 | (11)% | 3,056 | 2,731 |
| Franchisee advisors | 7,499 | 7,571 | 7,651 | 7,611 | 7,642 | 2% | 7,499 | 7,642 |
| Total branded financial advisors | 10,555 | 10,634 | 10,829 | 10,598 | 10,373 | (2)% | 10,555 | 10,373 |
| Securities America, Inc. registered representatives | 1,817 | 1,793 | 1,763 | 1,744 | 1,703 | (6)% | 1,817 | 1,703 |
| Total financial advisors | 12,372 | 12,427 | 12,592 | 12,342 | 12,076 | (2)% | 12,372 | 12,076 |
| Employee advisor retention | 60% | 63% | 63% | 63% | 62% | | 60% | 62% |
| Franchisee advisor retention | 91% | 93% | 93% | 93% | 93% | | 91% | 93% |
| Gross dealer concession per branded advisor (in thousands) | $ 44.7 | $ 45.0 | $ 49.2 | $ 51.1 | $ 54.3 | 21% | $ 88.5 | $105.4 |
| **Client Relationships** | | | | | | | | |
| Total clients (in thousands) | 2,770 | 2,779 | 2,786 | 2,774 | 2,781 | — | 2,770 | 2,781 |
| Client retention | 93% | 93% | 93% | 93% | 94% | | 93% | 94% |
| Branded advisor clients (in thousands) | 2,480 | 2,480 | 2,482 | 2,466 | 2,466 | (1)% | 2,480 | 2,466 |
| Clients with a financial plan percentage | 44% | 44% | 45% | 45% | 45% | | 44% | 45% |
| Financial plans sold (in thousands) | 58 | 55 | 61 | 66 | 59 | 2% | 121 | 125 |

# Variance of 100% or greater.

3

\* This exhibit page is taken from Page 3 of Exhibit 99.2 of Ameriprise's 7-25-2007, Form 8-K, Second Quarter 2007 filing with the Securities Exchange Commission. Emphasis in red added.