IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSHUA ROGERS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 07 C 6876 |
| AMERIPRISE FINANCIAL SERVICES, INC., | ) ) ) ) |
| Defendant. | ) ) |

## ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIM OF AMERIPRISE FINANCIAL SERVICES, INC.

Defendant, Ameriprise Financial Services, Inc., ("Defendant" or "Ameriprise"), answers Plaintiff, Joshua Rogers's ("Rogers" or "Plaintiff") Complaint and sets forth its Counterclaim as follows:

### PARTIES

1. Rogers is a resident of the State of Illinois.

**ANSWER:** Upon information and belief, Defendant admits the allegations contained in Paragraph 1 of the Complaint.

2. Ameriprise is a corporation organized and existing under the Laws of the State of Delaware.

**ANSWER:** Defendant admits the allegations contained in Paragraph 2 of the Complaint.

### COMMON FACTS

3. At all relevant times, Ameriprise was and remains a nationwide financial services firm whose agents, advisors and representatives are engaged in the sales of publicly traded securities as defined by the Investment Advisors Act of 1940 and the Securities Exchange Act of 1934.

**ANSWER:**  Defendant admits that it is a registered broker-dealer which distributes a wide variety of financial planning, products and services to the public through a national sales force. The remaining allegations contained in Paragraph 3 contain conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is required, Defendant denies those allegations.

4. Rogers was hired by Ameriprise in 1999 as a financial advisor. Between 1999 and 2001, Rogers was: (1) Ameriprise's number one producing financial advisor among first year advisors in the nation for the year 2000; (2) awarded the President's Award for Outstanding Quality of Financial Advice three times in three years; (3) maintained outstanding scores on client satisfaction surveys; and (4) never had a complaint registered against him from any of Ameriprise's clients.

**ANSWER:**  Defendant admits that Plaintiff was hired by Ameriprise in 1999 as a financial advisor. Defendant further admits that Rogers received the President's Award for Outstanding Quality of Financial Advice once in 2001. Defendant denies the remaining allegations contained in Paragraph 4 of the Complaint.

5. In 2001, Rogers was promoted to the position of District Manager of Sales in Washington D.C. In this capacity, Rogers: (1) grew the largest and most productive district in the Washington DC/Baltimore market group; (2) was ranked Ameriprise's number one District Manager in the nation by 2003; (3) achieved an average of ninety-percent (90%) retention of the advisors working under him as District Manager; and (4) maintained a "Gold Team" status in production levels as an advisor, an unprecedented accomplishment nationwide among other District Managers.

**ANSWER:**  Defendant admits that Plaintiff was promoted to District Manager in Washington D.C. in 2001. Defendant further admits that, as of December 2003, Rogers achieved a 91% retention rate for advisors working under him as District Manager. Defendant denies the remaining allegations contained in Paragraph 5 of the Complaint.

6. In 2003, Rogers was promoted to the position of Field Vice President of Sales in Chicago, Illinois. When Rogers took over as Field Vice President in Chicago, the area was ranked number 112 out of 115 areas in Ameriprise.[1] By the end of 2005, Rogers had turned

---

[1] In 2003, Ameriprise was doing business under the name "American Express Financial Advisors".

around the Chicago market into the number one area in the nation. Rogers received the highest possible performance ratings (top three percent of all field executives) given by senior management for three straight years.

**ANSWER:** Defendant admits that Plaintiff was promoted to Field Vice President in Chicago, Illinois in November 2003. Defendant further admits that in 2003, Ameriprise was doing business as American Express Financial Advisors. Defendant further admits that the Chicago-O'Hare area office where Rogers was Field Vice President was ranked first in the nation for the months of November and December 2005. Defendant denies the remaining allegations contained in Paragraph 6 of the Complaint.

### Ameriprise's Senior Management Encourages Financial Advisors to Employ Sales Techniques That Violate the Illinois Securities Law of 1953.

7.　　At all relevant times, Ameriprise's agents, advisors and representatives were engaged in the sale of universal variable life insurance policies ("VUL"). The policyholders of the VULs were required to bear the market risk as it pertained to the cash value of said policies in that the cash values were invested in mutual funds, rendering the same "securities".

**ANSWER:** Defendant admits that variable universal life ("VUL") insurance policies are one of many investment products offered by its financial advisors. The remaining allegations in Paragraph 7 contain conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is required, Defendant denies those allegations.

8.　　At all relevant times, Ameriprise maintained financial services offices throughout the United States. Ameriprise's corporate management kept track of the successes and failures of each regional office vis-à-vis their counter-parts nationwide. Field vice presidents were encouraged to competitively best their intra-corporate colleagues in financial services sales.

**ANSWER:** Defendant admits that at all relevant times, it maintained financial services offices throughout the United States. Defendant further admits that one of the ways, among others, it monitors the performance of each area office is by comparing the performance of area offices to each other. Defendant denies the remaining allegations contained in Paragraph 8 of the Complaint.

9. During the year 2006, Rogers learned that some of his intra-corporate competitive colleagues were employing a dubious sales technique for the sales of VULs called the "million dollar step-down sales technique". Ameriprise has numerous written training materials and/or manuals regarding techniques for selling VULs. However, none of the materials refer to the million dollar step-down sales technique because of its unscrupulous nature.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Plaintiff believes he "learned" during the year 2006, and therefore denies those allegations. Defendant admits that it has various training materials for use by its financial advisors regarding sales of VULs, among other investment products. Defendant denies the remaining allegations contained in Paragraph 9 of the Complaint.

10. Under the million dollar step-down sales technique, Ameriprise's financial advisors were misrepresenting facts to prospective purchasers, specifically, that it would be cheaper to purchase $1,000,000 VULs rather than purchasing next lower steps of the same (i.e. $750,000 and $500,000). In addition to the aforementioned misrepresentation, said advisors were also fallaciously telling customers that if they purchased a VUL with a one million dollar death benefit, Ameriprise would initiate a post-contractual reduction of said death benefit so the customer could lock in a lower unit cost of insurance upon executing a VUL.

**ANSWER:** Defendant denies the allegations contained in Paragraph 10 of the Complaint.

11. During the year 2006, Ameriprise's senior management began encouraging financial advisors company-wide to systematically employ the use of the million dollar step-down sales technique for purposes of selling VULs.

**ANSWER:** Defendant denies the allegations contained in Paragraph 11 of the Complaint.

12. The million dollar step-down sales technique violates the Illinois Securities Law of 1953, at 815 ILCS 5/12J in that Ameriprise's financial advisors systematically misrepresented to prospective purchasers that it is cheaper to purchase $1,000,000 VULs as opposed to purchasing lesser policies. This is a material misrepresentation used company-wide to falsely entice prospective customers into purchasing larger VULs because out-of-pocket expenses are greater for $1,000,000 VULs vis-à-vis smaller VULs. Additionally, the financial advisors are encouraged to systematically avoid advising prospective purchasers that once an algorithm is applied to calculate the minimum no-lapse premium for VULs, the application: (a) increases the prospective purchaser's premium to a greater extent as it pertains to $1,000,000 VULs compared to a smaller policy; and (b) aggravates the disparity between cost of insurance to prospective purchaser and the total premium between $1,000,000 VULs and smaller policies.

**ANSWER:** The first and second sentences of Paragraph 12 contain conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is required, Defendant denies those allegations. Defendant denies the remaining allegations contained in Paragraph 12 of the Complaint.

13. The intention and effect of the above misrepresentations is, by means of company-wide artifice, to defraud potential purchasers of securities and to: (a) increase premiums paid to Ameriprise; (b) increase commissions paid to financial advisors employing the million dollar step-down sales technique; and (3) increase total policies and aggregated death benefits sold by Ameriprise for purposes of bettering its rankings among its competitors.

**ANSWER:** The allegations contained in Paragraph 13 contain conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is required, Defendant denies those allegations. Defendant denies the remaining allegations contained in Paragraph 13 of the Complaint.

14. The million dollar step-down sales technique sales technique additionally violates the Illinois Securities Law of 1953, at 815 ILCS 5/12J in that Ameriprise's financial advisors systematically misrepresent to prospective purchasers of VULs that Ameriprise would be willing to initiate post-contractual reductions of death benefits so that the customer could lock in lower unit costs of insurance upon executing a VUL and/or omit disclosing that reductions in death benefits require the policyholder to initiate said reduction.[2] Under the million dollar step-down sales technique, financial advisors were encouraged by Ameriprise to advise prospective purchasers to buy $1,000,000 VULs even when said purchasers indicated they wished to purchase policies with lesser death benefits via the misrepresentation and/or omission from disclosure described in the sentence above. In reality, Ameriprise representatives never initiated death benefit reductions for their VULs purchasers. Rather, by taking no action and via the misrepresentations and/or omissions from disclosure described above, the policy holder continues to pay the $1,000,000 VUL premium throughout the life of the policy even though he or she never intended to do so and was defrauded by Ameriprise representatives into believing he or she would never have to.

**ANSWER:** The first sentence of Paragraph 14 contains legal conclusions to which no responsive pleading is required. To the extent a responsive pleading is required, Defendant

---

[2] Under the VULs sold by Ameriprise, upon executing a VUL the policy holder is allowed a thirty day window to review the prospectus. The prospectus is mailed to the policy holder after the policy holder purchases the policy and is the only medium of expression in which the policy holder is notified that he or she has the obligation to reduce his or her death benefits if he or she intends to.

denies those allegations. Defendant admits that it provides copies of VUL contracts to VUL policy holders, who are allowed 30 days to review the policies. Defendant denies the remaining allegations contained in Paragraph 14 of the Complaint.

15. In 2006, Rogers learned of an Ameriprise internal investigation of one its Field Vice Presidents, Ted Jenkins ("Jenkins"). Ameriprise disciplined Jenkins for forging the signatures of its policy holders on documents entitled "Financial Plan Assurance Delivery Forms" and "Client Insurance Delivery Receipts" ("Policy Review Forms") as they pertained to VULs. The Policy Review Forms and the prospectuses, as company procedure, were to be mailed to policy holders after said policy holders purchased VULs and were required by Ameriprise to be signed and returned to Ameriprise. The date affixed by the policyholder would commence the policyholder's thirty-day period that policyholders were allowed to review the terms of the VULs. By forging the signatures, the effected policyholders never had policies delivered to them and/or were defrauded out of their right to review and cancel the VULs.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Plaintiff believes he "learned" in 2006, and therefore denies those allegations. Defendant admits that certain forms and documents are sent to and signed by Ameriprise clients who purchase VULs policies and that such clients have 30 days to review the policies. Defendant denies the remaining allegations contained in Paragraph 15 of the Complaint.

16. In a series of conversations between September 2006 and May 2007, Rogers was advised by Robert Whalen ("Whalen")[3] that Ameriprise's upper management was encouraging the use of the million dollar step-down sales technique as a company-wide sales technique. In each such conversation, Rogers advised Whalen that he believed the million dollar step-down sales technique violated the securities laws which regulated Ameriprise, especially in light of the situation involving Jenkins. Whalen encouraged Rogers to comply with the wishes of upper management and disregard his concerns regarding the illegality of the million dollar step-down sales technique.

**ANSWER:** Defendant admits that, at all relevant times, Robert Whalen was the Group Vice President for the market group that included Chicago and had direct supervisory authority

---

[3] Whalen is the Group Vice President for the Chicago market for Ameriprise. At all relevant times, Whalen had supervisory authority over Rogers.

1-CH/203662.1                                              6

over Rogers. Defendant denies the remaining allegations contained in Paragraph 16 of the Complaint.

17. Each time that Whalen encouraged Rogers to comply with the million dollar step-down technique, Rogers refused. Furthermore, during each such conversation, Rogers vehemently urged Whalen to investigate the impropriety of the sales technique and use his authority to prohibit Ameriprise representatives from utilizing Rogers' objections notwithstanding, the million dollar step-down sales technique was and remains the most pervasive sales technique employed by Ameriprise financial advisors.

**ANSWER:** Defendant denies the allegations contained in Paragraph 17 of the Complaint.

### Ameriprise Senior Management Encourages Corporate Officers To Violate The Illinois Criminal Code

18. At all relevant times, Ameriprise was obligated under the above-cited provision of the Securities Exchange Act of 1934 to file 15(d) disclosures with the Securities Exchange Commission.

**ANSWER:** The allegations contained in Paragraph 18 contain conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is required, Defendant refers Plaintiff to the Securities Exchange Act of 1934, the text of which speaks for itself.

19. During the fourth economic quarter of 2006, Rogers was told by Whalen, Peter Volarde[4] and Brian Heath[5] that all field vice presidents were to falsify effective dates of, and, if necessary, forge delayed effective dates for, all financial advisor terminations of employment[6]. Specifically, Rogers was directed to make it appear if any financial advisor resigned in the fourth economic quarter, to make his or her personnel resignation paperwork to falsely reflect that said resignation occurred in the First economic quarter of 2007.

---

[4] Peter Volarde ("Volarde") is the Senior Vice President of Ameriprise. At all relevant times, Volarde had supervisory authority over Rogers.

[5] Brian Heath ("Heath") is the Executive Vice President of Ameriprise. At all relevant times, Heath had supervisory authority over Rogers.

[6] If a financial advisor terminated his employment, the advisor would tender a resignation form affixing the date of resignation upon the form. It was these affixations regarding the effective date of resignations that Rogers was instructed to forge to reflect dates after Ameriprise's 2006 Form 10-K annual report was due.

**ANSWER:** Defendant admits that at all relevant times, Peter Velardi was a Senior Vice President at Ameriprise and that Brian Heath was the President, U.S. Advisor Group, at Ameriprise. Defendant denies the remaining allegations contained in Paragraph 19 of the Complaint.

20. Rogers' superiors explained to Rogers that Ameriprise needed to dilute the impact of a disappointing performance in numerous Generally Accepted Accounting Principle ("GAAP") and non-GAAP metrics reported in Ameriprise's Form 10-K annual report for the year ending 2006, required of its 15(d) disclosures. Rogers refused stating that falsifying and forging said records would cause Ameriprise to intentionally file false 15(d) disclosures with the Securities Exchange Commission.

**ANSWER:** Defendant denies the allegations contained in Paragraph 20 of the Complaint.

21. Since Rogers' promotion to Field Vice President, Rogers' superiors propagated that Ameriprise's historical underwhelming annual performances in traditional GAAP metrics were offset by more subtle metrics, such as quantity of "employee advisors." However, the numbers from the anticipated year ending in 2006 threatened Ameriprise's customarily relied upon crutch.

**ANSWER:** Defendant denies the allegations contained in Paragraph 21 of the Complaint.

22. During the fourth economic quarter of 2006, Rogers received notices of termination of employment from some of the financial advisors under his charge. In each such instance, he accurately documented the true dates of terminations for each such financial advisor, rather than falsifying and/or forging the advisors' effective dates of resignation.

**ANSWER:** Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22, and therefore denies those allegations.

23. During the fourth economic quarter of 2006, Rogers was confronted by Whalen regarding his refusal to abide by the direction given to all field vice presidents regarding employment terminations of financial advisors. Whalen specifically directed Rogers to forge the effective date of a particular financial advisor who terminated his employment with Ameriprise in December 2006. Rogers refused, stating his obedience to such instructions would be both unethical and in violation of the law. It was the field vice presidents' reports of termination and new hirings that were used as Ameriprise's raw data for its 15(d) filings for the metric of advisor growth.

**ANSWER:** Defendant denies the allegations contained in Paragraph 23 of the Complaint.

24. Upon information and belief, Rogers believes that despite his refusal to abide by the direction given to all field vice presidents regarding employment terminations of financial advisors, most other field vice presidents complied with such instruction.

**ANSWER:** Defendant denies the allegations contained in Paragraph 24 of the Complaint.

25. By falsifying and forging the effective dates of financial advisor terminations in the manner demanded by Whalen, Volarde and Heath would cause Ameriprise's 15(d) filings to falsely reflect that Ameriprise had a significantly greater number employee financial advisors employed by Ameriprise than it did.

**ANSWER:** Defendant denies the allegations contained in Paragraph 25 of the Complaint.

26. For any corporate officer and/or director to cause Ameriprise to file 15(d) disclosures with the Securities Exchange Commission containing a material misstatement or omission, having the intent to defraud/or evade financial disclosures, violates the Illinois Criminal Code at 720 ILCS 5/16-26, 720 ILCS 5/5-2 and/or 720 ILCS 5/8-2.

**ANSWER:** Paragraph 26 contains conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is required, Defendant denies those allegations.

27. A review of Ameriprise's 15(d) filings evidences what has been reported above. According to Ameriprise's Form 10-K annual report, dated February 27, 2007 ("Exhibit A"), Ameriprise reported declining performances in such metrics as total revenue, net income (compared to 2004) and net cash provided by operating activities. Ameriprise reported increases in debt, accounts payable and accrued expenses as well as total liabilities. A review of Ameriprise's Form 8-K filings ("Exhibit B") reveals that the number of financial advisors employed by Ameriprise peaked at 3,178 in the fourth quarter of 2006. Not surprisingly, by the first of quarter 2007, that number had declined to 2,987 (equivalent to a six percent decline) and 2,371 (equivalent to a fourteen percent decline compared to the fourth quarter of 2006) by the second quarter of 2007.[7]

---

[7] See page three of Rogers' Exhibit B. It should be noted that percentages quoted above compare Form 8-K employee advisors from the first and second quarters of 2007 to the fourth quarter of 2006. Ameriprise's percentages as indicated on page 3 of Exhibit B compare second quarter performances between 2006 and 2007.

**ANSWER:** Defendant refers Plaintiff to its filings with the Securities and Exchange Commission, the texts of which speak for themselves. Defendant denies the allegations contained in Paragraph 27 to the extent inconsistent therewith.

28. Shortly after Ameriprise released its first quarter 2007 Form 8-K 15(d) disclosures, Whalen confronted Rogers regarding Rogers refusal to abide by the direction given to all field vice presidents regarding employment terminations of financial advisors. Rogers then raised again his previously stated objections regarding Ameriprise's violations of laws as alleged above and argued passionately that Ameriprise needed to take action to remedy the same and urged Whalen to use his authority to do so.

**ANSWER:** Defendant denies the allegations contained in Paragraph 28 of the Complaint.

29. On June 19, 2007, Ameriprise terminated Rogers' employment, motivated by his objections to Ameriprise's violations of law, as well as other illegal motives on the part of Ameriprise.

**ANSWER:** Defendant admits that Rogers's employment with Ameriprise was terminated on May 29, 2007. Defendant denies the remaining allegations contained in Paragraph 29 of the Complaint.

30. Approximately six weeks later, Ameriprise released its second quarter 2007, Form 8-K 15(d) disclosures reporting a fourteen percent decline in employee advisors from December 2006.

**ANSWER:** Defendant refers Plaintiff to its filings with the Securities and Exchange Commission, the texts of which speak for themselves. Defendant denies the allegations contained in Paragraph 30 to the extent inconsistent therewith.

**COUNT I**
**RETALIATORY DISCHARGE**
**(THE MILLION DOLLAR STEP-DOWN SALES TECHNIQUE)**

31. Plaintiff repeats and realleges paragraphs 1 through 30 as though fully set forth herein.

**ANSWER:** Defendant incorporates its Answers to Paragraphs 1-30 as its Answer to Paragraph 31.

32. Rogers' discharge by Ameriprise was in retaliation for Rogers' activities of opposing, objecting, and refusing to employ the million dollar step-down sales technique.

**ANSWER:** Defendant denies the allegations contained in Paragraph 32 of the Complaint.

33. Ameriprise's systematic and company-wide use of the million dollar step-down sales technique violates the Illinois Securities Law of 1953, at 815 ILCS 5/12J as alleged in paragraphs 12 through 14 above.

**ANSWER:** Defendant denies the allegations contained in Paragraph 33 of the Complaint.

34. Plaintiff's discharge violates a clear mandate of public policy.

**ANSWER:** Defendant denies the allegations contained in Paragraph 34 of the Complaint.

35. As a direct and proximate result of Defendant's conduct, Rogers has suffered injury and damages in amounts according to proof at trial.

**ANSWER:** Defendant denies the allegations contained in Paragraph 35 of the Complaint.

WHEREFORE, Rogers prays of this Honorable Court to enter a judgment in favor of Rogers and against Ameriprise in excess of One-Hundred Thousand Dollars ($100,000). Rogers further prays that he be awarded his costs and be granted such other relief as is just and equitable. Rogers also requests an award of punitive damages to be determined at trial.

**ANSWER:** Defendant denies the allegations contained in the WHEREFORE clause and further denies that Plaintiff is entitled to any relief whatsoever.

## COUNT II
## RETALIATORY DISCHARGE
## (AMERIPRISE'S FALSIFIED 15(d) FILINGS BEFORE THE SEC)

36. Plaintiff repeats and realleges paragraphs 1 through 35 as though fully set forth herein.

**ANSWER:** Defendant incorporates its Answers to Paragraphs 1-35 as its Answer to Paragraph 36 of the Complaint.

37. Rogers' discharge by Ameriprise was in retaliation for Rogers' activities of opposing, objecting, and refusing to falsify effective dates of and/or forge delayed effective dates for, all financial advisor terminations of employment, so as to make it appear that Ameriprise's field force growth of financial advisors was significantly growing when in fact it was precipitously plummeting.

**ANSWER:** Defendant denies the allegations contained in Paragraph 37 of the Complaint.

38. Ameriprise's systematic and company-wide use of the million dollar step-down sales technique violated the Illinois Criminal Code at 720 ILCS 5/16-26, 720 ILCS 5/5-2 and/or 720 ILCS 5/8-2, as alleged in paragraphs 23 through 26 above.

**ANSWER:** Defendant denies the allegations contained in Paragraph 38 of the Complaint.

39. Rogers' discharge violates a clear mandate of public policy.

**ANSWER:** Defendant denies the allegations contained in Paragraph 39 of the Complaint.

40. As a direct and proximate result of Ameriprise's conduct, Rogers has suffered injury and damages in amounts according to proof at trial.

**ANSWER:** Defendant denies the allegations contained in Paragraph 40 of the Complaint.

WHEREFORE, Rogers prays of this Honorable Court to enter a judgment in favor of Rogers and against Ameriprise in excess of One-Hundred Thousand Dollars ($100,000). Rogers further prays that he be awarded his costs and be granted such other relief as is just and equitable. Rogers also requests an award of punitive damages to be determined at trial.

**ANSWER:** Defendant denies the allegations contained in the WHEREFORE clause and further denies that Plaintiff is entitled to any relief whatsoever.

## AFFIRMATIVE DEFENSES

1. Plaintiff's claims are barred by the doctrines of equitable estoppel and/or unclean hands.

2. Plaintiff's claims are barred to the extent they arose outside of the applicable statute of limitations.

3. Plaintiff is barred from seeking relief to the extent he has failed to mitigate his damages.

4. Plaintiff's claims are subject to mandatory arbitration.

5. Plaintiff has waived his right to a jury trial.

6. Any claim for damages must be offset based on Plaintiff's material breach of his Repayment Agreement with Ameriprise.

7. Defendant reserves the right to modify or supplement its Affirmative Defenses set forth herein as a result of further allegations and/or discovery in this case.

8. All other allegations, facts and conclusions of law in Plaintiff's Complaint not previously admitted or denied are expressly denied.

## COUNTERCLAIM

Defendant/Counter-plaintiff, Ameriprise Financial Services, Inc., for its Counterclaim against Plaintiff/Counter-defendant Joshua Rogers, alleges and states as follows:

### PARTIES, JURISDICTION AND VENUE

1. Defendant/Counter-plaintiff Ameriprise Financial Services, Inc. ("Ameriprise") is a corporation organized under the laws of the State of Delaware with its principal place of business in Minnesota.

2.  Plaintiff/Counter-defendant Joshua Rogers ("Rogers") is a resident of the State of Illinois.

3.  This Court has supplemental jurisdiction over the Counterclaim asserted herein pursuant to 28 U.S.C. § 1367(a) because the Court has original jurisdiction over the Complaint pursuant to 28 U.S.C. § 1332. The claims asserted in the Counterclaim are related to the claims in the Complaint such that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Further, the Counterclaim is "compulsory" within the meaning of Fed. R. Civ. P. 13(a) because it arises out of the same transaction or occurrence that is the subject matter of the Complaint, and the Counterclaim does not require for its adjudication the presence of third parties over whom the Court cannot acquire jurisdiction.

4.  Venue is proper in this Court pursuant to 28 U.S.C. 1391(a) in that, among other things, Rogers is a resident of this District and a substantial part of the events or omissions giving rise to the claims asserted in the Counterclaim took place in this District.

**BACKGROUND FACTS**

5.  On March 2, 2007, Rogers entered into and signed a Repayment Agreement with Ameriprise. (A copy of the Repayment Agreement is attached hereto as Exhibit 1.) Under Rogers's Repayment Agreement, Ameriprise agreed to provide Rogers an advance on his 2007 Annual Incentive Award ("AIA") in a gross amount of $108,827. (*Id.* at ¶ 1.) Rogers was to receive three quarterly payments of $36,276, less applicable withholdings, on March 27, 2007, June 19, 2007 and September 25, 2007. (*Id.*)

6.      In consideration for his employment by Ameriprise and Ameriprise's agreement to pay Rogers an advance on his 2007 AIA, Rogers agreed in the Repayment Agreement as follows:

> ...I agree that I will repay the full amount of the advance paid to me if my employment with [Ameriprise] ends prior to payment of the 2007 Annual Incentive Award, scheduled to be paid in February 2008. When my employment ends, if I will receive no future Annual Incentive Award or Annual Leadership Bonus payouts, I agree to repay the full amount of the advance immediately.

(*Id.* at ¶ 3.)

7.      Further, Rogers authorized Ameriprise to deduct from his paycheck any amounts owed to Ameriprise under the Repayment Agreement. (*Id.* at ¶ 6.) And if such deductions were insufficient to cover the total amount of the advance Ameriprise paid to Rogers, he agreed to repay such outstanding amount upon Ameriprise's written demand for payment. (*Id.*)

8.      Pursuant to the terms of the Repayment Agreement, Rogers received a $36,276 quarterly advance payment, less withholdings, for a net amount of $23,544.31, on March 27, 2007.

9.      Rogers's employment with Ameriprise was terminated on May 29, 2007. Under the terms of the Repayment Agreement, Ameriprise is entitled to repayment of the $23,544.31 advanced to Rogers in March 2007 because Rogers is not eligible to receive any future AIA or Leadership Bonus. (*Id.* at ¶ 3.) Upon Rogers's termination, there were insufficient amounts in his paycheck to repay the advance payment.

10.     On December 12, 2007, Ameriprise demanded, in writing, that Rogers repay the $23,544.31 advanced to him. (A copy of the demand letter is attached hereto as Exhibit 2.) Rogers had until December 31, 2007 to repay these funds to Ameriprise. (*Id.*) Rogers has failed

to do so. As such, pursuant to the terms of the Repayment Agreement, Ameriprise is entitled to obtain the total AIA advanced to Rogers in the amount of $36,276. (Ex. 1 at ¶¶ 3, 6.)

## COUNT I
## BREACH OF CONTRACT

11. Ameriprise incorporates by reference and realleges paragraphs 1 through 11, inclusive, as though fully set forth herein.

12. Although Rogers has received a written demand for repayment, he has failed and refused to perform his contractual obligations to repay Ameriprise the funds it advanced to him under the Repayment Agreement.

13. By virtue of this failure and refusal, Rogers is in breach of the Repayment Agreement.

14. As a result of this breach, Ameriprise has incurred damages and has been forced to incur attorneys' fees and other expenses to prosecute this action, which fees and expenses Ameriprise is entitled to recover under the Repayment Agreement. (*Id.* at ¶ 6.)

WHEREFORE, Ameriprise respectfully prays that this Court:

1. Award Ameriprise actual damages in the amount of $36,276, sustained as a result of Rogers's breach of his Repayment Agreement;

2. Award Ameriprise its costs and expenses, including but not limited to attorneys' fees, in bringing and pursuing this action;

3. Award Ameriprise pre-judgment and post-judgment interest; and

4. Award Ameriprise any other and further relief to which it is entitled.

Dated:  January 14, 2008

Steven M. Malina, Esq.
Sari M. Alamuddin, Esq.
Beth A. Black, Esq.
Morgan, Lewis & Bockius LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601
(312) 324-1000

Respectfully submitted,

_____/s/ Beth A. Black_____
One of the Attorneys for Defendant
AMERIPRISE FINANCIAL SERVICES, INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2008, I electronically filed the foregoing **Answer and Affirmative Defenses to Plaintiff's Complaint and Counterclaim of Ameriprise Financial Services, Inc.** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

> Troy Owens, Esq.
> Barney, Owens, Laughlin & Arthur, LLP
> 9 W. Crystal Lake Road
> Lake in the Hills, Illinois 60156

By:  /s/ Beth A. Black
      Beth A. Black