# EXHIBIT A

# American Express Financial Advisors Inc.

## Field Vice President Agreement

796    228.04.1089

This is an Agreement, made at Minneapolis, Minnesota, by and between American Express Financial Advisors Inc., its affiliated insurance agencies, IDS Life Insurance Company and IDS Life Insurance Company of New York (collectively "Company") and you.

(Print Full Name)

_Joshua D. Rogers_

executed and effective as of the date shown on the last line of this Agreement. It defines your relationship with Company as a Field Vice President. Both you and Company promise to comply with the terms of this Agreement and any properly executed Riders to this Agreement.

### Section I — Definitions

For purposes of this Agreement, the terms listed below have the special meanings shown.

(a) "Company" means American Express Financial Advisors Inc., its affiliated insurance agencies, IDS Life Insurance Company and IDS Life Insurance Company of New York.

(b) "Affiliate" means any partnership, business, trust, company or corporation affiliated with Company at any time while this Agreement is in effect.

(c) "Field Vice President" means a person who has executed a Field Vice President Agreement with Company.

(d) "Certificates" means the face amount Certificates of IDS Certificate Company and contractual plan Certificates of any other contractual plan.

(e) "Stock" means the capital Stock of registered investment companies.

(f) "Services" means financial planning, advisory, securities brokerage, tax or other financial Services.

(g) "Products" means Certificates, Stock, other securities or investments, lending products, life insurance and annuity policies and contracts, and other insurance products.

(h) "Issuer" means the company or entity that issues a Product or Service distributed or offered by Company itself or by Company as the agent of the another company or as the branch manager of IDS Life Insurance Company of New York.

(i) "Records and Materials" means all records, files, manuals, blanks, forms, materials, supplies, stationery, literature, seminar materials, training materials, computer software, licenses, papers and books that Company or an Issuer furnishes or leases to you for use, with or without charge, or that you create or prepare, including notes, memos and works of authorship, in connection with the performance of this Agreement.

(j) "Compensation Plan" means the rules, policies and schedules as amended and published from time to time that are related to the payment of salaries, bonuses and other fees and compensation.

(k) "Client" means a person or entity who (1) purchases or holds a Product or Service acquired from or through Company or an Affiliate or one of their employees or any other person selling or distributing Products or Services offered by the Company or its Affiliates with consent of Company or the Affiliate, or (2) authorizes Company, and employees or any other person selling or distributing Products and Services offered by the Company or its Affiliates to make personal financial planning presentations to it or its employees or members, or (3) is a member of a Client's household.

### Section II — Business Activities

You agree to devote all of your working time and effort, to the best of your abilities, to performing your duties as a Field Vice President under this Agreement with Company, and under any similar agreement with any Affiliate. You will preform those duties that are assigned to you from time to time. You will also act as an instructor at any training school designated by Company and provide such services as may be requested by Company. You will, during your employment under this Agreement, act and perform your duties and responsibilities in line with the directions of Company.

You will comply with all applicable laws and regulations. You will secure all licenses or registrations required by law or Company and maintain a surety or fidelity bond satisfactory to Company. This Agreement will terminate upon cancellation or non-renewal of any license, registration or bond which you are required to have by the terms of this Agreement.

### Section III — Undertakings

(a) Violation of Company's Interests  You will not, without written consent of Company, use any information you acquired while this Agreement was in force in a manner adverse to the interests of Company, an Affiliate or Issuer. You also will not:

(1) Do any act to damage the goodwill of Company, an Affiliate or Issuer;

(2) Encourage or induce any person to terminate an agreement with Company, an Affiliate or Issuer without Company's consent;

(3) Encourage or induce any Client to sell, surrender or redeem any Product or Service distributed or offered by Company, an Affiliate or Issuer without Company's consent;

(4) Do any act which may cause a Client or prospective Client of a Product or Service to refrain from purchasing or making purchase payments thereon

All of the above provisions apply while the Agreement is in effect and after it ends.

(b) Bonds, Licenses and Registrations. You will not allow any employee of Company or any other person selling or distributing Products and Services offered by the Company or its Affiliates to seek any applications or any Clients for Products or Services until such person has secured all licenses or registrations required by law or Company, obtained a surety or fidelity bond satisfactory to Company and complied with all other requirements of Company, an Affiliate or Issuer that related to their activities under their agreements.

(c) Full Disclosure. In dealing with Clients or prospective Clients, you will fully explain the terms of Products or Services, not make any untrue statements and state all relevant facts. You will also take steps to prevent and promptly advise Company of the failure of an employee or any other person selling or distributing Products and Service offered by the Company or its Affiliates to make a full disclosure.

(d) Policies of Company. You will comply with all rules, regulations and policies of Company, including but not limited to the American Express Code of Conduct, the Individual Treatment Policy and the Client Relations Guide.

(e) Reports, Collections and Remittances

You must:

(1) Promptly deliver premium receipts and policies or contracts originating from applications solicited for life insurance and annuities designated by Company, but only when applicant appears to be in good health and the initial premium (if required) has been duly paid, and other receipts and policies or contracts as required by Company or Issuer.

(2) Collect and immediately report and remit to Company, an Affiliate or Issuer any initial premiums and any payments you receive for Products or Services and any other money or property you receive on behalf of Company, an Affiliate or Issuer.

(3) Send payments, money or property you collect to Company, an Affiliate or Issuer without commingling it with your own money or property.

(f) You will take steps to prevent any activity or practice on the part of any employee of Company or any other person selling or distributing Products and Service offered by the Company or its Affiliates that is in violation of their agreement with Company or Company's rules, policies or procedures. You also will promptly notify Company about any such activity or practice.

(g) Authority Limited. You cannot alter or change provisions of an Product or Service distributed by Company or through the Company field force. You also cannot incur any liability or expense on behalf of company, an Affiliate or any Issuer.

## Section IV — Compensation

1. You will be provided compensation in accordance with the rules and policies established by the Company and in accordance with applicable law. You understand the Company may in its sole discretion amend or modify its compensation policies or plans from time to time. Any compensation paid pursuant to this Agreement and any riders to it will constitute payment in full for all services rendered to the Company.

2. In addition to other appropriate legal remedies, Company has the right to apply any amount payable to you by Company against any debt you owe Company or an Affiliate or Issuer.

3. Company may charge you and your compensation for any amounts advanced to you, any amounts paid on your behalf or any amounts charged to you under this Agreement.

4. When this Agreement ends, you must pay, on demand, any debt you owe Company. Payment is required whether the debt is for charges made before or after this Agreement terminates. You agree to and authorize the assignment of any debt you owe Company to any Affiliate. You also agree to repay any assigned debt to the assignee.

5. Except for clerical error and undisclosed material facts, the regular compensation statement Company issues to you is considered to be an accurate and complete record of all the amounts Company owes you. Settlement on the basis of these regular statements constitutes full satisfaction and agreement between you and Company about the amounts defined just above. The only exceptions occur in the case of a claim to the contrary made within 60 days after the statement is issued, clerical error or undisclosed material fact.

## Section V — Restrictions on Your Activities

1. "Using Information You Acquire"

(a) All Records and Materials are the property of the Company, an Affiliate or one of their associated companies. All rights to Records and Materials that you prepare or create in connection with the performance of this Agreement are hereby assigned to the Company. You agree that you will not reproduce or allow the reproduction of the Records and Materials in any manner whatsoever, except pursuant to written policy or consent of the Company.

(b) You are responsible for the safekeeping of these items. Such Records and Materials are open to inspection by the Company at any time. You must return them and all copies of them to the Company at any time on request. When this Agreement ends, all of these items remain the Company's property. You must return all of them, together with any licenses you have or control, without demand or compensation.

(c) While this Agreement is in effect and after it ends, you agree that you will not reveal the contents of any Company property or allow them to be revealed, except in connection with carrying out your duties under this Agreement. You will not reveal the names and addresses of Company Clients or any other information about them, including financial information. You also will not reveal any of this information about potential Clients, to whom a presentation has been made by an employee or any other person selling or distributing Products and Service offered by the Company or its Affiliates, who might reasonably be expected to do business with the Company or an Affiliate. You will not allow any of this information about Clients or potential Clients to be revealed.

(d) You agree that the identity of Clients and potential Clients is confidential information and a "trade secret" as defined by law. For one year after this Agreement ends, you agree not to use any such information in connection with any business in competition with the Company or an Affiliate.

(e) You specifically acknowledge that, pursuant to this Agreement, you will receive valuable and confidential trade secret information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Company. In recognition and in consideration for these and other benefits, to protect the confidentiality of Company's Client information and to protect Company's goodwill, you covenant that (a) during the term of this Agreement and (b) for one year after the expiration or termination of this Agreement in the geographic area within one hundred (100) miles of the office from which you operated, you shall not, either directly or indirectly, for yourself or through, on behalf of, or in conjunction with any person or entity:

(1) Encourage, assist, participate, induce, receive compensation for, or attempt to induce any Client or prospective business or customer to terminate an agreement with Company, Company's Affiliates or Issuers.

(2) Encourage, assist, participate, induce, receive compensation for, or attempt to induce any Client or prospective business or customer to terminate, surrender, redeem, or cancel any action related to Products and Services acquired or ordered from or through Company, Company's Affiliates or Issuers without prior approval of Company.

(3) Employ or seek to employ any person who is at that time employed by Company or any other person selling or distributing Products and Services offered by the Company and its Affiliates or otherwise directly or indirectly induce such person to leave his or her employment or Affiliation with Company.

(4) Solicit, or receive compensation from or related to, any Clients that you contacted or learned about while operating under this Agreement to open an account other than an Company account or to sell any investment, financial or insurance Products or Services.

(5) Open an account for, receive compensation for, or provide or offer to provide any investment, financial, or insurance Products or Services to any Clients that you contacted or learned about while operating under this Agreement.

(6) Disparage Company, its Affiliates, employees or any other person selling or distributing Products and Service offered by the Company or its Affiliates, and/or Products and Services. For purposes of this Section V, an "Issuer" is a company or entity that issues Products and Services distributed or offered by Company, Company's Affiliates, or Company as the agent of another company.

(7) Disclose any trade secret or other proprietary information of Company or an Affiliate or Issuer or use any trade secret or other proprietary information in competition with Company or an Affiliate or an Issuer.

(8) You understand and agree that information about Clients, including Clients' identities, is confidential information and a trade secret. This client information is the sole and exclusive property of Company and its Affiliates or Issuers.

2. "Violation of These Restrictions"

(a) You agree that:

(1) The violation of the provisions in this section will result in damage to the Company that cannot be determined exactly and for which the Company has no adequate remedy under the law; and that

(2) The Company has the specific right to enforce these provisions; and that

(3) The Company is entitled to an injunction to keep you from violating the provisions or to enforce them.

## Section VI — Other Restrictions

(a) Sales Literature. You must have written approval from Company or an Affiliate before you issue or use in any way material about Products and Services distributed by Company, an Affiliate or Issuer or about them. You will also take steps to prevent and promptly advise Company of the use of unapproved material by any employee or any other person selling or distributing Products and Services offered by the Company and its Affiliates.

(b) Trafficking or Switching. You will not make any agreement with any person for the repurchase or resale of Products or Services distributed or offered by Company, an Affiliate or Issuer. You also will not seek or purchase (except from Company, an Affiliate or Issuer) or traffic in any security of Company, an Affiliate or Issuer. You will not resort to "trafficking" in or "switching" of the securities of any other companies, of insurance policies or of governmental obligations. You will take steps to prevent and promptly advise Company of any such activity or practice on the part of any employee or any other person selling or distributing Products and Services offered the by the Company and its Affiliates.

(c) You will not attempt to cancel or rescind any insurance policy, annuity contract or other Company product nor make any refunds to a policy or contract holder or make any settlement with a Client without the written approval of Company.

## Section VII — Termination

(a) This Agreement terminates in the event of:

(1) Your death or retirement.

(2) Your total and permanent disability.

(3) Cancellation or non-renewal of any license, registration or bond you are required to have by the terms of this Agreement.

(4) A violation of any provision of this Agreement.

(b) Termination by Parties. This Agreement may be terminated by either party with or without cause at any time and for any reason. You agree that you are an employee-at-will of the Company.

## Section VIII — Termination Claims

If this Agreement ends, you have no claim for profits, anticipated profits or earnings. You also have no claim for a refund or reimbursement of any funds you have advanced or expenses you have paid or incurred in connection with your responsibilities under this Agreement or for any other reason. The only exception will occur if Company specifically authorizes reimbursement in writing before termination of the Agreement.

## Section IX — Prior Agreements

This Agreement terminates and supersedes any existing agreements between you and the Company. You understand you will have no right to participate in any benefit program, or receive any commissions, overwriting or other compensation payable under or pursuant to any prior agreement with the Company.

## Section X — Miscellaneous

(a) This Agreement may be amended only in writing. The amendment must be signed by an authorized officer of the Company.

(b) The terms of this Agreement are governed by Minnesota law.

(c) If Company waives any provisions of this Agreement, the waiver applies only to that provision, not to any other parts of the Agreement. A waiver is effective only when it is in writing and signed by an authorized officer of the Company.

(d) If the laws of any state prohibit any provision of this Agreement, the laws apply only to that provision. They do not invalidate the remaining portion of the Agreement.

(e) Any notice to be given to Company under this Agreement must be given to the corporate office of Company in Minneapolis, Minnesota. Any notice given to you under this Agreement is considered to have been given if delivered to you in person or mailed to your last known address on file with the Company's corporate office in Minneapolis.

(f) You and Company both acknowledge that no oral or written representations were made about this Agreement or about the relationship between you and Company that are not set forth in this Agreement.

## Section XI — Arbitration

1. You and the Company agree to arbitrate any dispute, claim or controversy that may arise between you and the Company or a customer or any other person ("Claims"), unless otherwise agreed to in writing by the parties. To the extent that such Claims are required to be arbitrated under the rules, constitutions, or by-laws of the National Association of Securities Dealers ("NASD"), as amended from time to time, they will be arbitrated in accordance with the policies and procedures established by the NASD.

2. If either the NASD declines to administer an arbitration of any Claims or the NASD rules do not allow for arbitration of any Claims, the parties agree that the Claims shall be finally decided by arbitration conducted pursuant to the Commercial Dispute Resolution Procedures of the American Arbitration Association ("AAA"), and its Supplementary Rules for Securities Arbitration, or the AAA National Rules for the Resolution of Employment Disputes, as applicable. In addition, you and the Company specifically agree that all Claims, statutory or otherwise, which allege discrimination, including but not limited to claims of sexual harassment, shall be finally decided by arbitration pursuant to the AAA unless otherwise agreed to in writing by the parties.

3. By agreement of the Parties in writing, disputes may be resolved in arbitration by a mutually agreed-upon organization other than the NASD or the AAA.

4. In consideration of the promises and the compensation provided in this Agreement neither you nor the Company shall have a right (a) to arbitrate any Claim on a class action basis or in a purported representative capacity on behalf of any Advisors, employees, applicants or other persons similarly situated, (b) to join or to consolidate in an arbitration Claims brought by or against another Advisor, employee, applicant or the Company, unless otherwise agreed to in writing by all parties; (c) to litigate any Claims in court or to have a jury trial on any Claims; and (d) to participate in a representative capacity or as a member of any class of claimants in an action in a court of law pertaining to any Claims. Nothing in this Agreement relieves you or the Company from any obligation you or it may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Policy.

5. Either you or the Company may compel arbitration of any Claims filed in a court of law. In addition, either you or the Company may apply to a court of law for an injunction to enforce the terms of this Agreement pending a final decision on the merits by an arbitration panel pursuant to this provision.

6. The Company shall pay all fees, costs or other charges charged by the NASD, AAA or any other organization administering an arbitration proceeding pursuant to these provisions that are above and beyond the filing fees of the federal or state court in the jurisdiction in which the dispute arises, whichever is less. You and the Company shall each be responsible for their own costs of legal representation, if any except where such costs of legal representation may be awarded as a statutory remedy by the arbitrator.

7. Any award by an arbitration panel shall be final and binding upon the parties. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant party or its assets.

8. This Agreement is covered and enforceable under the terms of the Federal Arbitration Act.

**Section XII — Effective Date**

In witness of the provisions of this Agreement as described above, you and Company have entered into this Agreement with the understanding that it becomes effective on __December 24__, __2003__
(Year)

American Express Financial Advisors Inc., its affiliated insurance agencies, IDS Life Insurance Company and IDS Life Insurance Company of New York

By _____

Its _____Assistant Secretary_____

Field Vice President Signature _____

Please Print Name: __Joshua D. Rogers__

A.D. Number: __65__

Advisor Number: __38555__

Social Security Number: __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__

(To be executed in duplicate — one copy returned to Field Vice President.)

# EXHIBIT B

BEFORE THE FINANCIAL INDUSTRY REGULATORY AUTHORITY
-----------------------------------------------------------X
In the Matter of the Arbitration Between

JOSHUA D. ROGERS                                    FINRA Case No.: 07-03502

             Claimant,

       -against-

AMERIPRISE FINANCIAL SERVICES, INC.

            Respondent.
-----------------------------------------------------------X

*FINRA Dispute Resolution, Inc.*
**RECEIVED DEC 2 8 2007**

    Claimant, by and through his attorney, files this Statement of Claim as follows:

    Simply stated, Claimant was wrongfully terminated from the employ of Respondent and was terminated in direct violation of Respondent's own employment manual and policies. The termination was contrived with vindication and with the intent of preventing Claimant from obtaining compensation and stock of Respondent to which Claimant was entitled. It is presently estimated that the loss to Claimant is in excess of $1,250,000.

    By way of background, Claimant had been employed as a Registered Representative with Respondent from October 2005 to June 19, 2007, the date upon which he was wrongfully terminated. Immediately prior to his employment with Respondent, Claimant had been employed as a Registered Representative by American Express Financial Advisors, who upon information and belief was acquired in its entirety by Respondent in or about October, 2005.

    During his employment with Respondent, Claimant served as the Field Vice President in the north half of the Chicago area with responsibilities that included supervision and sales management of the Ameriprise financial advisors. His compensation consisted of a base salary, but his compensation package was more dependant upon quarterly and annual bonus payments which were correlated to the performance of the geographic sector he managed. The quarterly

bonuses consisted of cash payments while the annual bonus consisted of a cash component as well as stock of Ameriprise in various forms as described further below.

For the year immediately prior to the wrongful termination in 2007, Claimant received income in excess of $475,000 and received an additional compensation award relating to that year consisting of additional cash and stock options. When the 2007 calendar year began, Claimant continued to receive his base salary of approximately $76,000. At the end of the first quarter, Claimant received a rating of "G2" which represents the second highest rating in the Ameriprise quarterly rating system. Claimant was terminated in June of 2007 just before the quarterly review was due for the second quarter. The reason for the termination as set forth by Respondent in Claimant's U-5 was " Violation of Company Policy-Code of Conduct- Non Securities Related". Claimant contends that the Respondent terminated Claimant, inter alia, in retaliation for Claimant's refusal to conform to actions of Respondent which were unlawful and therefore the termination was wrongful.

In any event, regardless of the reasons for the termination, Respondent failed to follow its own Consequence Management Guidelines when dealing with the termination or investigation of the business practices of Claimant to the extent that business practices were the reason for the termination, and also failed to follow its own guidelines relating to Human Resource issues if that was the basis for the termination. Simply stated, Respondent terminated Claimant wrongfully and did so for reasons which will become apparent through the Discovery process.

To the extent that Respondent will assert in its Answer that Claimant somehow violated firm policy with regard to dealings with clients of Respondent, Claimant will show that Claimant had approval for all activities in which he engaged.

It will also be proven that no action to which Respondent would assert was the basis for the termination, caused any client of Respondent to sustain any loss, and furthermore, did not cause Respondent itself to sustain any harm.

As a result of the wrongful termination by Respondent, Claimant seeks damages presently estimated to be in excess of $1,250,000 consisting of lost wages, benefits, attorney fees, forum fees and punitive damages.

Respectfully Submitted,
BRIAN REIS
Attorney for Claimant
80 Broad Street- 33rd Floor
New York, New York 10004
(212) 785-5170

# EXHIBIT C

Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL 60601
Tel: 312.324.1000
Fax: 312.324.1001
www.morganlewis.com

# Morgan Lewis
COUNSELORS AT LAW

**Steven M. Malina**
312-324-1155
smalina@morganlewis.com

January 17, 2008

## *VIA FACSIMILE & U.S. MAIL*

Matthew Luzi
Case Administrator
FINRA Dispute Resolution
Midwest Region
55 West Monroe Street, Suite 2600
Chicago, Illinois 60603

      Re:   *Joshua D. Rogers v. Ameriprise Financial Services, Inc.*
             FINRA Dispute Resolution Case No: 07-03502

Dear Mr. Luzi:

Please be advised that this firm has been retained to represent Ameriprise Financial Services, Inc. ("Ameriprise") in the above-referenced FINRA arbitration. This letter shall constitute Ameriprise's request pursuant to FINRA Code of Arbitration Procedure Rule 13203 that the Director of Arbitration decline to permit the use of this arbitration forum in this matter for the reasons detailed below.

Claimant Joshua D. Rogers ("Rogers") alleges in his Statement of Claim that he was wrongfully terminated from the employ of Ameriprise, "*inter alia*, in retaliation for Claimant's refusal to conform to actions of Respondent which were unlawful and therefore the termination was wrongful." (Statement of Claim, p. 2). FINRA served Rogers's Statement of Claim on Ameriprise on or about December 28, 2007, and it is attached as Exhibit A.

Approximately two months earlier, on October 30, 2007, Rogers filed a Complaint in the Circuit Court of Cook County, Illinois (Case No. 07 L 012299). In his Complaint, Rogers raises precisely the same allegations he raises in his FINRA Statement of Claim, to wit, that he was discharged by Ameriprise in retaliation for his opposition, objection and refusal to engage in unlawful activities. Rogers's Complaint is attached as Exhibit B. On or about December 6, 2007, Defendant Ameriprise filed its Notice of Removal to the United States District Court for

Chicago  Philadelphia  Washington  New York  Los Angeles  San Francisco  Miami  Pittsburgh
Princeton  Palo Alto  Dallas  Harrisburg  Irvine  Boston  London  Paris  Brussels  Frankfurt  Tokyo

1-CH/199969.1

Morgan Lewis
COUNSELORS AT LAW

Matthew Luzi
January 17, 2008
Page 2

the Northern District of Illinois, Eastern Division ("Federal Court Action"). The Federal Court Action is currently pending and is designated Case No. 07 C 6876.

Moreover, on September 14, 2007, Rogers filed a whistleblower claim with the United States Occupational Safety and Health Administration pursuant to the Sarbanes-Oxley Act of 2002 ("OSHA Claim"). Rogers's OSHA Claim sets forth virtually identical facts as those set forth in his Complaint and alleges that Ameriprise wrongfully terminated Rogers and violated various federal securities laws. Rogers's OSHA Claim is attached as Exhibit C.

It is well established that once a plaintiff chooses to pursue his claims in court, he has waived his right to arbitration if no objection is raised by the defendant. *Auto Mechanics Local 701 Welfare and Pension Funds v. Vanguard*, 502 F.3d 740, 746 (7th Cir. 2007) (the choice of an arbitral forum can be waived early in the proceedings, and generally is waived once the party who later wants arbitration elects a judicial forum); *Grumhaus v. Comerica Sec., Inc.*, 223 F.3d 648, 650 (7th Cir. 2000) (plaintiffs' knowing selection of judicial forum and participation in litigation was plainly inconsistent with a desire to arbitrate). "Litigants may turn their back on their right to enforce an agreement to arbitrate." *Auto Mechanics*, 502 F.3d at 747. Although Rogers's employment agreement with Ameriprise contains an arbitration agreement, he elected to litigate his wrongful termination and retaliatory discharge claims in a judicial, not arbitral, forum in October 2007. Ameriprise did not object to proceeding in court and, in fact, removed the action and filed an answer to Plaintiff's complaint. Rogers's attempt to get a second bite at the apple is a blatant abuse of FINRA's Dispute Resolution arbitration forum, and should be rejected by the Director of Dispute Resolution.

Based on the foregoing, Ameriprise respectfully requests that FINRA decline to permit the use of its arbitration forum. If you have any questions regarding the foregoing, please feel free to contact me.

Very truly yours,

*Steven M. Malina*

Steven M. Malina
/mbd
Enclosure

cc:   Troy Owens, Esq. (Attorney for Claimant, Via Facsimile & U.S. Mail)
      Mark Matuga, Esq. (Via U.S. Mail)

# EXHIBIT D

LAW OFFICE OF<br>
**BRIAN H. REIS**

80 BROAD STREET- 33rd FLOOR  
NEW YORK, NEW YORK 10004

TEL (212) 785-5170  
FAX (212) 785-5179  
E-MAIL, esqkape@aol.com

February 1, 2008

By Facsimile (301-527-4852)  
Matthew Luzi  
FINRA Dispute Resolution  
Midwest Region  
55 West Monroe Street, Suite 2600  
Chicago, Illinois 60603

      Re: Rogers v. Ameriprise Financial Inc.  
          FINRA Case No.: 07-03502

Dear Sir/ Mame:

    I represent the Claimant in this matter. Simply and respectfully stated, Rule 13203 of the FINRA Code of Arbitration Procedure does not allow the Director of Arbitration to decline the use of FINRA as the arbitration forum given the facts of the claims involved herein. The application of Respondent is as misguided as the termination of Claimant was wrongful.

    By way of background, Rule 13203 (a) states in relevant part:

(a) The Director may decline to permit the use of the NASD arbitration forum if the Director determines that, given the purposes of NASD and the intent of the Code, the subject matter of the dispute is inappropriate, or that accepting the matter would pose a risk to the health or safety of arbitrators, staff, or parties or their representatives. Only the Director or the President of NASD Dispute Resolution may exercise the Director's authority under this rule.

    Respondent has provided no basis whatsoever for the Director of Arbitration to grant the relief Respondent seeks based upon the only aspect of Rule 13203 that could apply, to wit, that the subject matter of the dispute is somehow inappropriate. The reason for the failure of Respondent to do so is because the issues in this dispute ARE ENTIRELY APPROPRIATE for FINRA jurisdiction. The FINRA dispute involves allegations of wrongful termination by a registered representative against his former FINRA-member firm.

1

LAW OFFICE OF
**BRIAN H. REIS**

80 BROAD STREET- 33rd FLOOR
NEW YORK, NEW YORK 10004

TEL (212) 785-5170
FAX (212) 785-5179
E-MAIL csqkapc@aol.com

    The efforts of Respondent to have FINRA dismiss the claims pursuant to Rule 13203 is patently misguided as it is clear to all practitioners in the securities law arena that disputes between registered representatives and their former employer have always been properly heard before the NASD, and now FINRA, pursuant to Rule 13200, and its predecessor code sections.

    If Respondent truly has issues with the other actions to the extent they believe the claims are duplicative, the efforts to dismiss or remove should have been filed in those actions in the Circuit Court in Cook County and the United States District for the Northern District of Illinois, Eastern District. Claimants believes Respondent did not do so because it attempted to achieve the result it desired across the path of least legal resistance, to wit, by filing a frivolous application to FINRA and not incurring the wrath of a Federal or State court judge for frivolous actions.

    In conclusion, the claims in the case are directly within the jurisdiction of FINRA arbitration and the application by Respondent to deny use of this forum should be denied.

Very Truly Yours,

Brian H. Reis

Cc: Beth Black, Esq

# EXHIBIT E

**FINRA Dispute Resolution** 

Midwest Region
55 West Monroe Street | Suite 2600 | Chicago IL | 60603 | 312 899 4440 | Fax 312 236 9239

February 22, 2008

Steven M. Malina
Morgan Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL  60601

Subject:   FINRA Dispute Resolution Arbitration Number 07-03502
           Joshua D. Rogers v. Ameriprise Financial Services, Inc.

Dear Mr. Malina:

The Director of FINRA Dispute Resolution is in receipt of your request to decline FINRA's arbitration forum.

After careful consideration, the Director has decided to deny your request and the case will proceed in this forum accordingly. If you have any questions, please contact this office at the number below.

Very truly yours,

Matthew Luzi
Case Administrator
312-899-4428 Fax: 301-527-4852

ML1:GCG:LC53X
idr:07/07

RECIPIENTS:
   Brian H. Reis, Esq., Joshua D. Rogers
   80 Broad Street, 33th Floor, New York, NY  10004

   Steven M. Malina, Ameriprise Financial Services
   Morgan Lewis & Bockius LLP, 77 West Wacker Drive, Chicago, IL  60601